**Lynne HOLMAN, Relator,**

v.

**OLSTEN CORP., OLSTEN HEALTH CARE SERVICE, Department of Jobs and Training, Respondents.**

No. CX–86–102.

Court of Appeals of Minnesota.

June 10, 1986.

Lawrence W. Pry, Minneapolis, for Lynne Holman.

Olsten Corp., Olsten Health Care Service, pro se.

Hubert H. Humphrey, III, Atty. Gen., Donald E. Notvick, Asst. Atty. Gen., St. Paul, for Department of Jobs and Training.

Considered and decided by HUSPENI, P.J., and LESLIE and CRIPPEN, JJ., with oral argument waived.

## OPINION

CRIPPEN, Judge.

Relator appeals from the Commissioner's determination that she lost eligibility for unemployment compensation benefits. We reverse.

### FACTS

Lynne Holman was employed by the Hazelden Chemical Dependency Center as a prevention consultant from August 1984 until April 1985, at a salary of $20,700 per year. Holman has a masters degree in public health and several years' experience in her field. Due to a serious illness, Holman resigned her position at Hazelden in April. She applied for and began receiving $195 per week in unemployment compensation benefits. *See* Minn.Stat. § 268.09, subd. 1(2)(b) (1984) (separation from employment due to serious illness shall not disqualify the person for unemployment benefits).

Four months later, on August 19, 1985, Holman accepted an opportunity for part-time employment with respondent Olsten

Health Care Service. Holman's job was to coordinate placements of health care workers for Olsten, a temporary employment agency. Olsten hired Holman as a night representative, to work one or two nights a week and one weekend per month. The job required her to respond to telephone calls from clients between 5:00 p.m. and 8:30 a.m. and to assign individual health care workers to the callers. She was paid $15.00 per night plus $1.00 for each assignment she made.

Olsten initially scheduled Holman to work two nights the week of August 19, one night the following week, the weekend following the first week of September, one night the second week of September, and one more night in either the third or fourth week of that month. After working the first two nights, Holman had only earned $43.00 for about 12 hours' work. Holman was dissatisfied with the low wages. She also felt she had to handle too many calls and that the work was unduly stressful because of the many calls she received from patients complaining about the health care workers they had been assigned. After her second night of work, Holman voluntarily quit the job with Olsten.

As a result, a claims deputy found Holman had voluntarily terminated her employment with Olsten without good cause attributable to the employer. The claims deputy notified Holman that she was disqualified from receiving unemployment compensation benefits, including those attributable to her prior employment at Hazelden. On Holman's appeal, a department referee and then a Commissioner's representative affirmed the claims deputy's decision.

## ISSUE

Did Holman lose her eligibility for unemployment compensation benefits by quitting the part-time job with Olsten?

## ANALYSIS

■ Relator contends that respondent Commissioner erroneously disqualified her from receipt of unemployment compensation benefits by misapplying the Minnesota unemployment compensation statute and the judicial construction placed on the statute. The determination whether relator was properly disqualified presents a question of law upon which the appellate courts are free to exercise their independent judgment. *Smith v. Employers' Overload Co.*, 314 N.W.2d 220, 221 (Minn.1981).

■ Because the unemployment compensation statute is remedial in nature, it must be liberally construed to effectuate the public policy that unemployment reserves be used for the benefit of persons unemployed through no fault of their own. *Id.* at 221–22. For this reason the disqualification provisions of the statute are to be narrowly construed. *Id.* at 222. The courts give "great weight" to the construction placed upon a statute by the department charged with its administration. *Krumm v. R.A. Nadeau Co.*, 276 N.W.2d 641, 644 (Minn.1979). An unreasonable interpretation by the Commissioner, however, will not be upheld. *See* Minn.Stat. § 645.17(1) (1984).

The Commissioner's decision is founded upon a longstanding belief that any loss of employment with fault totally disqualifies a person from receiving benefits, even if the person is qualified due to a loss of a full-time job through no fault of his or her own and has been at fault only with regard to the loss of the part-time job opportunity. The basis for the Commissioner's position is the public policy articulated in the general statute on fault and the specific disqualification provisions for fault in quitting a job. *See* Minn.Stat. §§ 268.03, 268.09, subd. 1(1) (1984).

This is the fourth in a series of cases related to the Commissioner's stance on wrongful surrender of part-time employment and involving pronounced conflict between the Commissioner and the judiciary. The Commissioner's approach was first limited in *Berzac v. Marsden Building Maintenance Co.*, 311 N.W.2d 873 (Minn.1981). There, the supreme court demanded that there be no disqualification when an em-

ployee voluntarily quit a part-time job that was held concurrently with full-time employment and was surrendered before he lost the full-time position through no fault of his own. The court held that the "legislature could not have intended [the] unfortunate result" created by the Commissioner's conclusion "that if an individual voluntarily discontinues but one of multiple employment positions, the disqualification [arising from that act] precludes the receipt of benefits from any employer, regardless of the circumstances creating the unemployment." *Id.* at 875.

In a similar case, this court also reversed the Commissioner, who adhered to the position unsuccessfully argued to the supreme court in *Berzac. See Glende v. Commissioner of Economic Security,* 345 N.W.2d 283 (Minn.Ct.App.1984). The only distinction between the two cases was that the basis for the employee's disqualification after leaving the part-time job in *Glende* was misconduct while in *Berzac* the basis was the employee's voluntary termination of part-time employment. The court in *Glende* expressed concern over the Department's "refusal to apply the clear holding of *Berzac,*" noting that the Department

> repeated its erroneous practice of denying benefits from the full-time employment by virtue of a "spill-over" taint of disqualification from the previous part-time employment. Such action suggests an affirmative disrespect for the rule of law. * * * There is no justification for simply choosing to ignore applicable law.

*Id.* at 285.

The supreme court required an additional limitation on the Commissioner's stance in *Sticka v. Holiday Village South,* 348 N.W.2d 761 (Minn.1984). *Sticka* again dealt with part-time jobs held concurrently with a full-time position. Sticka, a structural engineer earning $10.65 per hour at her full-time job, had taken the part-time jobs to supplement her income after her employer reduced her hours. She earned $4.00 per hour as a cashier at one of the part-time jobs and $3.45 per hour as a stock clerk at the other. Sticka then lost the

full-time employment and qualified for unemployment benefits. Because she was unable to find other employment as a structural engineer in the local area, Sticka decided to quit the two part-time jobs and look for employment in other parts of the country.

Had Sticka been offered either of the part-time jobs during her job search, she could have declined them without jeopardizing her qualification for benefits, as neither of them would have been deemed "suitable employment" as defined by the statute. *Id.* at 763, n. 1. Despite this, the Commissioner found that Sticka's voluntary termination of her part-time employment disqualified her for all unemployment compensation benefits. Thus, Sticka's part-time work was treated as if it ended her unemployment.

The supreme court reversed, holding that the department was "misguided" in its self-proclaimed "all or nothing proposition" about one's status as employed or unemployed:

> Relator's retention of her part-time jobs neither plucked her from the ranks of the unemployed nor significantly reduced the benefits payable to her. * * * Since the relator qualified for at least partial benefits when she had part-time work, it makes no sense that on cessation of the part-time work for any reason, she should become disqualified from any and all benefits.

*Id.* at 763. The court held that events subsequent to Sticka's qualification for benefits were irrelevant

> since the relator cannot be disqualified for benefits for any acts or omissions which occur after her separation from employment with that employer. Minn. Stat. § 268.09, subd. 1(5) (1982).

*Id.*

*Sticka* involved the converse of the situation in *Berzac* and *Glende,* i.e., Sticka's loss of her full-time job preceded the termination of her part-time jobs. Because of this difference, *Sticka* addressed two sections of the unemployment compensation statutes that were not involved in the two

earlier cases. The first is Minn.Stat. § 268.09, subd. 1(5), dealing with misconduct after loss of employment. In addition, the supreme court's discussion of Sticka's qualification for partial benefits derives from section 268.04, subd. 23 (1984), which provides that an individual who is earning some wages is still deemed "unemployed" if the wages are less than the weekly benefit amount. Relator argues that these provisions also operate to protect her, because she was disqualified for acts occurring after her separation from employment from the qualifying employer and because her wages of $43 were less than her weekly benefit amount of $195. The Commissioner, however, distinguishes Holman's situation from that in *Sticka* and its precedents by insisting that the rule applies only to cases of concurrent employment. His ongoing posture is that fault in losing part-time employment should not be overlooked, regardless of other qualifying circumstances.

The Commissioner solidified this position in a 1984 administrative proceeding that specifically confined application of the earlier judicial decisions to "benefit period employment," that is, those part-time jobs held concurrently with the full-time job that prompted the qualification for benefits. The memorandum of the Commissioner in the 1984 case was incorporated into his order reviewed here. In the 1984 case, the Commissioner's representative wrote that "[w]e cannot believe under any stretch of the imagination that the legislature could intend to grant benefits to the claimant" where there was a gap between the full-time and part-time employments, or where several months lapsed between the two separations, or where the claimant was only technically "unemployed" because, by his own choice, he kept his pay from the part-time job below $25 per week so as to retain his eligibility for full benefits. The Commissioner's representative stated that any further extension of the principles in *Berzac, Glende*, and *Sticka* would mean that "the erosion of the basic principle that unemployment benefits are for those who are unemployed through no fault of their own will be largely complete."

Following the 1984 administrative decision, the Commissioner issued an internal memo directing a

change of policy with respect to separations from part-time employment which was held concurrent with other employment. In accordance with [*Berzac, Sticka,* and *Glende*], a claimant who has concurrent employment with two or more employers and separates from the part-time employment under disqualifying circumstances cannot be subject to a disqualification if there is a nondisqualifying separation from the full-time employment. The Courts held that benefits should not be denied under "unique" circumstances presented in the cases.

Alleging that *Sticka* represents "only an extension of the 'unique circumstances' giving rise" to the *Berzac* and *Glende* decisions and that Holman's case does not present such circumstances, the Commissioner has expressly relied on his 1984 decision and the internal memo to determine the immediate case. Having taken this position, the Commissioner also asserts that neither section 268.04, subd. 23 nor section 268.09, subd. 1(5) apply, arguing again that they apply only in the context of multiple concurrent employments.

Accordingly, the question before this court is whether the Commissioner's strongly expressed point of view is reasonable and in accord with the statute or whether the cases culminating in *Sticka* also govern fault in the loss of employment that is taken after the individual has begun receiving unemployment benefits. Because we find no rational distinction between the concepts articulated in *Sticka* and the situation facing us now, we cannot accept the Commissioner's position.

In both *Sticka* and *Berzac*, the employees left their part-time jobs for reasons that benefitted their opportunities for future full-time employment. This was not the case in *Glende*, where the employee was fired from his part-time job for misconduct. Yet all of these employees retained

their eligibility for unemployment benefits. As previously noted, the supreme court held in *Sticka* that because the relator there initially qualified for benefits, cessation of her part-time work "for any reason" had not "plucked her from the ranks of the unemployed." *See Sticka*, 348 N.W.2d at 763. The cases have not expressed any reason to base the determination of eligibility on lesser or greater degrees of fault in terminating the part-time employment.

■ There is nothing in either *Berzac* or *Sticka* indicating the supreme court intended to limit their application to part-time jobs held concurrently with full-time employment. The Commissioner will concede only that unemployment survives loss of part-time jobs held during the benefit period, those that shape the amount of benefits payable to an individual. Neither the cases nor the statutes justify this distinction. The "all or nothing proposition" makes no more sense for part-time work taken after benefits are received. Here also partial benefits are due. Here also the employee is protected from loss of her original eligibility due to later conduct. Moreover, relator's part-time job, which did not increase her benefit period wages, reduced her weekly benefits by the amount she earned at Olsten in excess of $25. *See* Minn.Stat. § 268.07, subd. 2(3) (1984). That the state is partially relieved of its responsibility to pay benefits due to the demonstrated diligence and willingness of individuals to find some additional means of support, even if it is not suitable employment for them, provides an additional basis for upholding Holman's continued eligibility to receive unemployment benefits.

■ As a guide for interpretation of employment security laws, the legislature has made this public policy statement:

Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state.

Minn.Stat. § 268.03 (1984). Even while working for Olsten, Holman was "unemployed" within the meaning of the unemployment compensation laws. Only if Holman subsequently failed to apply for or accept available and suitable work would she have been disqualified from receiving benefits. As in *Sticka*, the legislature could not have intended the unfortunate result of disqualifying relator; she has remained unemployed but has been willing to try less than suitable work and by so doing has partially alleviated the state's burden of support until she is once again able to join the ranks of the employed.

■ We agree the fault in loss of a part-time job taken after becoming unemployed may justify a reduction in benefits to the extent the wages earned in that job exceed $25 per week, the maximum earnings allowable while receiving benefits. *See* Minn.Stat. § 268.07, subd. 2(3) (1984). We remand so that any appropriate deduction of that kind is determined.

## DECISION

Relator is entitled to receive unemployment compensation benefits as a result of her separation from Hazelden through no fault of her own, regardless of the subsequent voluntary termination of her employment with Olsten. We remand for determination of those benefits consistent with this opinion.

Reversed and remanded.