*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0798**

Denise C. Esler,
Relator,

vs.

Community Veterinary Clinic, P.A.,
Respondent,

Department of Employment and
Economic Development,
Respondent.

**Filed February 16, 2016
Affirmed
Johnson, Judge
Dissenting, Connolly, Judge**

Department of Employment and
Economic Development
File No. 33255395-3

Peter B. Knapp, Kate Johnson (certified student attorney), Mitchell Hamline Law Clinic, St. Paul, Minnesota (for relator)

Ned Evan Ostenso, Thomas K. Cambre, Merrigan, Brandt, Ostenso & Cambre, P.A., Hopkins, Minnesota (for respondent Community Veterinary Clinic, P.A.)

Lee B. Nelson, Department of Employment and Economic Development, St. Paul, Minnesota (for respondent Department of Employment and Economic Development)

Considered and decided by Connolly, Presiding Judge; Johnson, Judge; and Klaphake, Judge.[*]

## UNPUBLISHED OPINION

**JOHNSON**, Judge

Denise C. Esler was employed as a veterinary assistant or veterinary technician at the Community Veterinary Clinic. Her employment ended after she refused to perform assigned duties related to the euthanasia of animals. After she sought unemployment benefits, the department of employment and economic development initially determined that she is ineligible for benefits because she was discharged for misconduct. After Esler filed an administrative appeal, an unemployment-law judge determined that Esler is ineligible for benefits because she quit her job without a good reason caused by her employer and because her employment was not unsuitable. We affirm.

## FACTS

Esler began employment with the Delano Vet Clinic in the summer of 2013. When she interviewed for the position, Esler informed her interviewer that she would not perform or assist with euthanasia. Esler adopted this position because, in 2000 or 2001, she assisted with the euthanasia of a pet and had a strong negative emotional response. The Delano Vet Clinic nonetheless offered her a job and agreed that she would not be required to perform or assist with euthanasia.

---

[*]Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

In April 2014, Dr. Tawnia Prior joined the veterinary staff of the Delano Vet Clinic. Dr. Prior later acquired the clinic, effective October 31, 2014, and began operating it as the Community Veterinary Clinic (CVC). Because Dr. Prior had worked with Esler, she was aware before the acquisition that Esler had an understanding with the Delano Vet Clinic that she was exempt from any duties related to euthanasia. Dr. Prior discussed Esler's aversion to euthanasia with her before the acquisition became effective. Both Dr. Prior and Esler testified that they had a conversation on the issue in late October, though their testimony differed somewhat. Dr. Prior testified that, on October 23, 2014, she met with Esler to discuss the policies that she intended to implement after the acquisition. Dr. Prior testified that she told Esler that her job duties would require her sometimes to transport a deceased pet for cremation or to help with euthanasia. Dr. Prior explained in her testimony that she was unwilling to exempt Esler from her usual duties because the clinic is small, so that altering employees' normal duties would be too disruptive and inefficient. Dr. Prior testified that Esler did not say that she would not perform duties related to euthanasia but rather said merely that "it would not go well." Esler testified that she had a brief interaction with Dr. Prior on October 31, 2014, which she characterized not as a meeting but, rather, as comments made in passing. Esler testified that Dr. Prior said, "[E]ventually you'll have to take in a dead body or help with the euthanasia."

On November 20, 2014, after the acquisition had become effective, Dr. Prior asked Esler to assist her by placing a catheter in an animal that was to be euthanized. Esler told Dr. Prior that she had arranged for another veterinary assistant to assist Dr. Prior by performing that task. Dr. Prior told Esler that Esler needed to assist with the euthanasia

3

and that the other veterinary assistant needed to work on a different task. Esler did not comply with Dr. Prior's request for assistance. Dr. Prior said to Esler that they would talk about it later.

One or two days later, Dr. Prior met with Esler in her office to discuss Esler's refusal to insert the catheter on November 20. Dr. Prior reiterated the needs of the CVC, Esler reiterated her aversion to participating in euthanasia, and both women quickly recognized that the situation would not work. Esler then stated that she was willing to stay at the CVC until Dr. Prior found a replacement. Dr. Prior testified that "it wasn't even really a direct discharge as more of in my mind an amicable leaving because this wasn't gonna work out for either of us." Before the conversation concluded, Dr. Prior raised the possibility of Esler remaining employed by the CVC as a receptionist, without any duties related to euthanasia. But this possibility was not explored further because both women recognized that Esler enjoys direct contact with animals. Dr. Prior testified that she mentioned a receptionist position as "an attempt to try and make it work, even though I do not want a receptionist only position" but that "it wasn't something that [Esler] was really interested in [and] it wasn't my ideal situation so it was a conclusion that it was just not gonna work in that respect either." Dr. Prior testified that Esler could have continued working for the CVC if she had been willing to assist with euthanasia. Esler testified that Dr. Prior "knew ahead of time" of Esler's objection to euthanasia and, thus, "should have expected that [she] couldn't help with [euthanasia]." Esler's last day of employment with the CVC was December 13, 2014.

4

Esler applied for unemployment benefits. In January 2015, the department made an initial determination that Esler is ineligible on the ground that she was discharged for misconduct. Esler filed an administrative appeal. In February 2015, an unemployment-law judge (ULJ) conducted an evidentiary hearing at which Esler and Dr. Prior testified. The ULJ issued a written decision upholding the initial determination of ineligibility but on different grounds, that Esler quit her employment without a good reason caused by the employer and that Esler did not quit because the work was unsuitable. In March 2015, Esler requested reconsideration, with the assistance of counsel. In April 2015, the ULJ denied the request for reconsideration and affirmed her prior ruling. Esler appeals by way of a writ of certiorari.

## D E C I S I O N

Esler argues that the ULJ erred by determining that she is ineligible for unemployment benefits. This court reviews a ULJ's decision denying benefits to determine whether the findings, inferences, conclusions or decision are affected by an error of law, are unsupported by substantial evidence in view of the entire record, or are arbitrary or capricious. *See* Minn. Stat. § 268.105, subd. 7(d) (Supp. 2015). The evidentiary hearing is an evidence-gathering inquiry and is conducted without regard to any particular burden of proof. *See* Minn. Stat. § 268.069, subd. 2 (2014); *Vargas v. Northwest Area Found.*, 673 N.W.2d 200, 205 (Minn. App. 2004), *review denied* (Minn. Mar. 30, 2004). The ULJ's factual findings are viewed in the light most favorable to the decision being reviewed, and this court defers to the ULJ's credibility determinations. *Skarhus v. Davanni's Inc.*, 721 N.W.2d 340, 344 (Minn. App. 2006). If the relevant facts are undisputed, we apply a *de*

5

*novo* standard of review to the question whether an applicant is eligible for benefits. *Grunow v. Walser Auto. Grp. LLC*, 779 N.W.2d 577, 579 (Minn. App. 2010).

## I. Quit Without Good Reason Caused by Employer

Esler argues that the ULJ erred by determining that she is ineligible on the ground that she quit her employment without a good reason caused by the employer.

As a general rule, a person who quit his or her employment is ineligible for unemployment benefits. Minn. Stat. § 268.095, subd. 1 (2014). The general rule is, however, subject to a limited number of exceptions. *See id.*, subd. 1(1)-(10). One exception to the quit rule is the exception for an applicant who quits employment for a good reason caused by the employer. *Id.*, subd. 1(1). Esler asserts two reasons why the ULJ erred in determining that this exception does not apply. First, she contends that she did not quit but, rather, was discharged. Second, she contends that, if she is deemed to have quit, she quit for a good reason caused by the employer.

## A.    Whether Esler Quit

Esler contends that she did not quit her employment because "no reasonable person with Ms. Esler's objections would believe he or she could remain employed for Dr. Prior in any capacity" and, thus, she "believed she was no longer employed" due to having been involuntarily terminated.

The unemployment statute provides definitions that help answer the question whether an applicant quit or was discharged. "A quit from employment occurs when the decision to end the employment was, at the time the employment ended, the employee's." Minn. Stat. § 268.095, subd. 2(a). In contrast, "A discharge from employment occurs when

6

any words or actions by an employer would lead a reasonable employee to believe that the employer will no longer allow the employee to work for the employer in any capacity." *Id.*, subd. 5(a). Whether an employee quit or was discharged is a question of fact. *Stassen v. Lone Mountain Truck Leasing, LLC*, 814 N.W.2d 25, 31 (Minn. App. 2012). This court will not disturb a ULJ's factual findings "as long as there is evidence in the record that reasonably tends to sustain them." *Stagg v. Vintage Place, Inc.*, 796 N.W.2d 312, 315 (Minn. 2011).

The ULJ found that Esler quit because she could have continued to work at the clinic if she had been willing to assist with euthanasia. The evidence in the agency record supports this finding. The ULJ asked Dr. Prior directly whether Esler could have continued working for the clinic if she had been willing to assist with euthanasia, and whether Esler understood that opportunity, and Dr. Prior answered in the affirmative. In addition, Dr. Prior testified that she raised the possibility of Esler remaining employed as a receptionist but that Esler was not interested in working at the clinic in that capacity. Esler's testimony corroborates Dr. Prior's testimony inasmuch as she agreed that she "wouldn't be happy" as a receptionist. This evidence indicates that "the decision to end the employment was, at the time the employment ended, the employee's" decision. *See* Minn. Stat. § 268.095, subd. 2(a). Thus, the ULJ did not err by finding that Esler quit her employment.

## B. Whether Esler Had Good Reason Caused by Employer

Esler contends in the alternative that, if she is deemed to have quit her employment, she quit because of a good reason caused by the employer. This exception applies only if

7

the employee quit for a reason "(1) that is directly related to the employment and for which the employer is responsible; (2) that is adverse to the worker; and (3) that would compel an average, reasonable worker to quit and become unemployed rather than remaining in the employment." *Id.*, subd. 3(a). These three requirements "must be applied to the specific facts of each case." *Id.*, subd. 3(b). In this case, the focus is on the third requirement. Esler asserts two reasons why her quit should be attributed to the employer.

First, she contends that the CVC should have exempted her from duties related to euthanasia because her aversion to euthanasia was reasonable. Under the statute, the relevant question is whether the applicant's reason for quitting "would compel an average, reasonable worker to quit." *Id.*, subd. 3(a)(3). The third requirement of the exception is satisfied only if "[t]he average, reasonable person, when faced with a similar choice, would have chosen to remain employed." *Dachel v. Ortho Met, Inc.*, 528 N.W.2d 268, 271 (Minn. App. 1995). Esler essentially concedes that her attitude concerning euthanasia is different from the norms that generally prevail at veterinary clinics. When asked by the department's questionnaire why she would not assist with euthanasia, she wrote that she is "too sensitive" and is prone to "cry harder than the owners sometimes." Esler's aversion to euthanasia is inconsistent with this court's caselaw, which provides that the "correct standard . . . is the standard of reasonableness as applied to the average man or woman, and *not to the supersensitive*." *Werner v. Medical Prof'ls LLC*, 782 N.W.2d 840, 843 (Minn. App. 2010) (quotation omitted) (emphasis added), *review denied* (Minn. Aug. 10, 2010). Furthermore, Esler does not contend that it is unusual for a veterinary clinic to offer euthanasia services or that the CVC deviates from an appropriate standard of care. To the

8

contrary, the ULJ found that "[i]t is customary for a veterinary technician to assist with euthanizing animals" and that "[i]t is reasonable for [the CVC] to expect veterinary [technicians] to assist with euthanasia" such that "[e]nforcing this expectation is not a good reason for quitting." In light of the agency record and the caselaw, we conclude that a reasonable person in Esler's position would not quit but would remain employed. Thus, Esler has not shown that she had a good reason to quit caused by the employer on the ground that her aversion to euthanasia is reasonable.

Second, Esler contends that Dr. Prior changed the terms of her employment by requiring her to perform all the usual duties of her position, including duties related to euthanasia. Specifically, she contends that "[g]ood reason to quit is generally found where an employer breached the terms of an employment agreement." But Esler has no evidence that the CVC breached an employment agreement between Esler and the CVC. During the evidentiary hearing, Esler did not state that she had an agreement with Dr. Prior or the CVC that she would be exempt from duties related to euthanasia after October 31, 2014. Esler testified merely that Dr. Prior "should have expected that I couldn't help with" euthanasia. Both Esler and Dr. Prior testified, however, that Dr. Prior sought to clarify for Esler, before Dr. Prior's acquisition of the clinic became effective, that Esler would be required to assist with euthanasia.

Because there was no agreement between Esler and the CVC that Esler would be exempt from duties related to euthanasia, Esler's argument relies on the agreement she had with her prior employer, the Delano Vet Clinic. The CVC, however, is a different employer. In each of the cases on which Esler relies, the employer breached an agreement

9

to which the employer was a party. *Krantz v. Loxtercamp Transp., Inc.*, 410 N.W.2d 24, 27 (Minn. App. 1987); *Baker v. Fanny Farmer Candy Shops No. 154*, 394 N.W.2d 564, 565-66 (Minn. App. 1986); *Helmin v. Griswold Ribbon & Typewriter*, 345 N.W.2d 257, 257-61 (Minn. App. 1984), *review denied* (Minn. June 12, 1984). Esler has not provided any evidence or legal authority that the CVC was bound by the agreement between the Delano Vet Clinic and Esler. Thus, Esler has not shown that she had a good reason to quit caused by the employer on the ground that the CVC breached an agreement with Esler.

In sum, the ULJ did not err by determining that Esler cannot satisfy the exception for a good reason to quit caused by the employer.

## II. Quit Because of Unsuitability

Esler also argues that the ULJ erred by determining that she is ineligible on the ground that she did not quit because the employment was unsuitable to her.

As stated above, a person who quit his or her employment generally is ineligible for unemployment benefits, subject to a limited number of exceptions. Minn. Stat. § 268.095, subds. 1(1)-(10). One exception to the quit rule is the exception for an applicant who "quit the employment within 30 calendar days of beginning the employment because the employment was unsuitable for the applicant." *Id.*, subd. 1(3). This exception "is designed to allow an individual who is unemployed to take temporary employment without losing benefit eligibility if that employment turns out to be unsuitable." *Wiley v. Dolphin Staffing*, 825 N.W.2d 121, 125 (Minn. App. 2012), *review denied* (Minn. Jan. 29, 2013); *see also Valenty v. Medical Concepts Dev., Inc.*, 503 N.W.2d 131, 134 (Minn. 1993) (stating, before enactment of section 268.095, subdivision 1(3), that "a person receiving unemployment

10

compensation benefits should not be penalized for taking an unsuitable job for a short time"). Employment is deemed to be suitable if it is "in the applicant's labor market area [and] is reasonably related to the applicant's qualifications," in light of "the degree of risk involved to the health and safety, physical fitness, prior training, experience, length of unemployment, prospects for securing employment in the applicant's customary occupation, and the distance of the employment from the applicant's residence," with primary emphasis on "the temporary or permanent nature of the applicant's separation from employment and whether the applicant has favorable prospects of finding employment in the applicant's usual or customary occupation at the applicant's past wage level within a reasonable period of time." Minn. Stat. § 268.035, subd. 23a(a), (b) (2014). Employment is deemed unsuitable if "the wages, hours, or other conditions of employment are substantially less favorable than those prevailing for similar employment in the labor market area." *Id.*, subd. 23a(g)(2). This court applies a *de novo* standard of review to the question whether employment was suitable for an applicant who quit the employment. *Wiley v. Robert Half Int'l, Inc.*, 834 N.W.2d 567, 569 (Minn. App. 2013).

The ULJ found that Esler's employment with the CVC was not unsuitable because "[i]t is customary for a veterinary technician to assist with euthanizing animals" such that "[e]mployment as a veterinary technician, with the requirement to assist with euthanizing animals, is not unsuitable employment for Esler." Esler contends that the ULJ erred because she "is not qualified to assist with or perform euthanasia." She notes that her experience in assisting with euthanasia "is limited to one experience over fourteen years ago," which resulted in "a significant emotional and physical response."

11

Whether employment is suitable depends on a multi-factor statutory analysis. *See* Minn. Stat. § 268.035, subd. 23a(a), (b), (g). Esler does not identify any statutory factor that weighs in her favor based on her aversion to euthanasia. Rather, the statutory factors generally support a finding that the employment is suitable. Because Esler previously was employed in essentially the same role in the same workplace (albeit by a different employer), it is apparent that the employment is "in the applicant's labor market area" and "is reasonably related to [her] qualifications." *See id.*, subd. 23a(a). The ULJ rejected Esler's argument concerning the unsuitability exception for essentially the same reasons that the ULJ rejected Esler's argument concerning the exception for a good reason to quit caused by the employer. We approve of those reasons.

Esler also contends that she was not qualified for her position with the CVC because she lacked the technical competence necessary to assist with euthanasia. More specifically, she asserts that she was employed by the clinic as a "veterinary assistant," not a "veterinary technician," and that "veterinary assistants" are not required to have proficiency in matters of euthanasia. Esler did not raise this issue during the evidentiary hearing. She raised it for the first time in her request for reconsideration, at which time she offered evidence in the form of materials published by a private certifying organization and the United States Bureau of Labor Statistics. She did so despite the fact that she consistently testified at the evidentiary hearing that she was employed by the CVC as a "veterinary technician," not a "veterinary assistant."

The ULJ resolved the issue by finding that Esler did not quit because she lacked proficiency in matters of euthanasia. Specifically, the ULJ found that Esler never informed

12

Dr. Prior that "she lacked the experience, training, skills, or knowledge to assist with euthanasia." The ULJ also found that Esler introduced no evidence at the evidentiary hearing that she lacked the preparation or skills necessary to insert a catheter into an animal. Rather, the ULJ found that Esler quit because she is prone to "an adverse emotional reaction to euthanasia." Accordingly, the ULJ found that Esler did not have good cause for an additional evidentiary hearing and, thus, did not consider Esler's evidence concerning the respective duties of veterinary technicians and veterinary assistants. *See* Minn. Stat. § 268.105, subd. 2(c) (2014). On appeal, Esler does not argue that the ULJ erred by not considering that evidence and by not reopening the evidentiary hearing. Thus, the evidence Esler offered with her request for reconsideration is not in the appellate record. *See Icenhower v. Total Auto., Inc.*, 845 N.W.2d 849, 857 (Minn. App. 2014), *review denied* (Minn. July 15, 2014). In any event, the ULJ properly analyzed Esler's request for reconsideration. Because there is no evidence that Esler refused to assist with euthanasia because she was not technically competent to perform the assigned tasks, Esler cannot show that she quit her employment with the CVC because it was unsuitable.

The department argues that Esler's unsuitability argument fails for another reason: that she did not quit within 30 days of beginning the employment, as required by the statute that sets forth the exception. *See* Minn. Stat. § 268.095, subd. 1(3). The department notes that Esler was employed by the CVC from November 1, 2014, until December 13, 2014, a period of more than 30 days. In *Wiley v. Dolphin Staffing*, this court concluded that, for purposes of the unsuitable-employment exception, a quit occurs when the employee gives notice of quitting, not on the employee's last day of employment. 825 N.W.2d at 125. The

13

department contends that the legislature later abrogated that part of the *Dolphin Staffing* opinion by amending section 268.095, subdivision 2(c), to read as follows: "An employee who seeks to withdraw a previously submitted notice of quitting is considered to have quit the employment, *as of the intended date of quitting,* if the employer does not agree that the notice may be withdrawn." 2014 Minn. Laws ch. 251, art. 2, § 14, at 861 (emphasis added). We question whether this provision applies in light of the fact that Esler did not seek to withdraw her notice of quitting. In any event, we need not decide the 30-day issue because our approval of the ULJ's reasoning is a sufficient basis for resolving Esler's argument concerning the unsuitability exception.

In sum, the ULJ did not err by determining that Esler cannot satisfy the exception for accepting employment that is unsuitable.

**Affirmed.**

14

**CONNOLLY,** Judge (dissenting)

I respectfully dissent. I would reverse the decision of the unemployment-law judge that relator quit without a good reason caused by the employer because I do not believe the record substantially supports that conclusion. "This court views the ULJ's factual findings in the light most favorable to the decision. This court also gives deference to the credibility determination made by the ULJ. As a result, this court will not disturb the ULJ's factual findings when the evidence substantially sustains them." *Peterson v. NW Airlines, Inc.*, 753 N.W.2d 771, 774 (Minn. App. 2008) (citations omitted), *review denied* (Minn. Oct. 1, 2008).

No one disputes that: (1) relator was a competent and hardworking employee who worked for respondent and respondent's predecessor for 16 years, (2) respondent's predecessor did not require relator to assist with euthanasia to maintain her job, and (3) respondent prefers that relator assist with euthanasia. What I do question is whether respondent made it absolutely clear to relator that assisting with euthanasia would be, or was, necessary for relator to be employed by respondent.

The hearing transcript reveals that, on either October 23 or October 31, relator had a conversation with respondent.[1] The ULJ credited respondent's version of the conversation:

---

[1] Respondent argues that this conversation occurred on October 23; relator maintains it took place on October 31. The ULJ found that it occurred shortly before October 31, but did not explain its credibility determination as required by Minn. Stat. § 268.105, subd.

> [I]n October, I believe it was the 23 when she and I met. I asked her specifically and let her know that . . . there would be times when she would have to take in a body for cremation, a[nd] if it was just [she] and I in the clinic . . . she would have to help with euthanasia, that that was part of the job. *Her response to that was that it would not go well.*

(Emphasis added.) However, what is missing from respondent's version of the conversation is any indication that respondent then told relator that, whether or not it would go well, assisting with euthanasia was now part of relator's job duties and, if she did not assist with euthanasia, she would be fired. Indeed, respondent specifically testified that "[relator] didn't say she wouldn't be able to assist, she just said it wouldn't go well."

Thus, for me it is simply not clear that relator knew from the October conversation that she would be required to assist with euthanasia to keep her job.

It is also not clear to me that, when relator quit on November 22, she knew that assisting with euthanasia was one of her job duties. Respondent also testified:

> So that would be roughly [November] 21 that I asked her to come into the office and discuss what had happened. [*I*]*n my mind*, . . . it was not gonna work out if I [couldn't] have her helping with the euthanasia. She came into my office, we sat down, it was a difficult discussion because . . . in general I do like [relator] and . . . the way she interacts with the pets. But at the same time I couldn't have one person not helping [with euthanasia]. It just disrupts the flow of the day when we have to pull somebody out of the position they're doing [to] assist in that task when it's not their primary duty for the day. And [relator] seemed to recognize this. . . . [*B*]*efore I even got too many words out she said*, it's okay, . . . she would stay on until I found somebody to replace her. So . . . it wasn't even really a direct discharge [but] more of . . . an amicable leaving because this wasn't gonna work out for either of us.

---

1a(a) (2014) (requiring a ULJ to set out the reason for crediting or discrediting testimony when the credibility of a witness has a significant effect on the outcome of a decision).

(Emphasis added.)

I do not disagree that relator then quit her employment, but I am simply not convinced that, when she quit, she knew that assisting with euthanasia was now a job duty she had to perform in order to remain in her job, because respondent had not specifically and unequivocally told her this. The record to me simply reveals that relator could not assist with euthanasia and that respondent preferred that she did. Preferring something is not the same as clearly requiring something as a condition of employment.

In any event, for purposes of receiving unemployment benefits, I believe that, even if relator did know she had to assist with euthanasia at the time she quit, she had a good reason caused by her employer for quitting. Our court is required to construe and apply the unemployment-benefit statutes in favor of awarding unemployment benefits, and any statutory provision that would preclude an applicant from receiving benefits must be narrowly construed. *Wiley v. Dolphin Staffing – Dolphin Clerical Grp.*, 825 N.W.2d 121, 124-25 (Minn. App. 2012), *review denied* (Minn. Jan. 29, 2013). Although Minn. Stat. § 268.095, subd. 1 (2014), makes an applicant who has quit employment ineligible for all unemployable benefits, it also makes an exception when "the applicant quit the employment because of a good reason caused by the employer as defined in subdivision 3." Minn. Stat. §268.095, subd. 1(1).

> A good reason caused by the employer for quitting is a reason:
>
> > (1) that is directly related to the employment and for which the employer is responsible;
>
> > (2) that is adverse to the worker; and

(3)  that would compel an average, reasonable worker to quit and become unemployed rather than remaining in the employment.

Minn. Stat. § 268.095, subd. 3(a) (2014).  "The correct standard for determining whether relator's concerns were reasonable is the standard of reasonableness as applied to the average man or woman, and not to the supersensitive." *Werner v. Med. Prof'ls LLC*, 782 N.W.2d 840, 843 (Minn. App. 2010) (quotation omitted).  The standard is an objective one. *Id.*  A good reason to quit is one that is "real, not imaginary, substantial, not trifling, and reasonable, not whimsical." *Ferguson v. Dep't of Emp't Servs.*, 311 Minn. 34, 44, 247 N.W.2d 895, 900 n.5 (1976) (quotation omitted).

Relator's reason for quitting was reasonable and not supersensitive.  It is not uncommon for an animal to be treated as a loyal member of a family.  Reasonable people, especially those who develop such an affinity for animals that they are compelled to find a job in which they can work with animals, can have a hard time dealing with an animal's passing.  Relator was one such person.  Nevertheless, she chose to work in the field of veterinary medicine because of her love for animals.  For more than a decade, relator did not shy away from dirty, grueling, and tiresome work, which involved cleaning and dealing with urine, vomit, blood, and diarrhea associated with pets.  She was merely unwilling to assist in euthanasia, desiring rather to switch with the person working at the front desk until the necessary assistance had been provided.

Relator has been abundantly clear about her refusal to assist with euthanasia: she never accepted any form of employment in which the duties included euthanasia, she never interviewed without clarifying her long-standing objection to assisting with euthanasia, and

her oral agreement with her previous employer, of which respondent was aware, was that she would not have to assist with euthanasia. In this situation, a reasonable person, having made every attempt to avoid assisting with euthanasia, would quit employment rather than assist with euthanasia as mandated by respondent. In light of the requirement that we construe and apply the unemployment-benefit statutes in favor of awarding unemployment benefits, *see Wiley*, 825 N.W.2d at 124-25, I believe this is enough to satisfy the good-reason-caused-by-the-employer exception to the unemployment statute.

Because I do not believe the record supports the ULJ's finding that relator quit without a good reason caused by her employer I would reverse the decision and award relator her unemployment benefits.